UNITED STATES of America,
Plaintiff–Appellee,

v.

Brandon J. SMITH, Defendant–Appellant.

No. 94–3337.

United States Court of Appeals,
Tenth Circuit.

Aug. 17, 1995

Michael G. Christensen, Asst. U.S. Atty. (Randall K. Rathbun, U.S. Atty., with him on the brief), Wichita, KS, for plaintiff-appellee.

Jack Focht (Kenneth G. Gale on the brief), of Focht, Hughey & Calvert, Wichita, KS, for defendant-appellant.

Before TACHA and HOLLOWAY, Circuit Judges, and ELLISON, District Judge.*

HOLLOWAY, Circuit Judge.

Defendant-appellant Brandon J. Smith was convicted on one count of possession of cocaine base with intent to distribute, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and on one count of using or carrying firearms during and in relation to a drug trafficking crime. 18 U.S.C. § 924(c)(1) and 18 U.S.C. § 2. A charge of conspiracy to possess cocaine base with intent to distribute was dismissed by the court at the close of the prosecution's case. Defendant was sentenced to 63 months' incarceration on the cocaine charge and to 60 months' incarceration on the weapons charge, to run consecutively. A $1,000 fine and a $100 special assessment were also imposed. Defendant brings this direct appeal.

## I

Defendant was arrested during the execution of a search warrant for his residence. The search warrant was issued by a state judge on the basis of an affidavit describing how a "controlled buy" of cocaine had been effected from defendant at his residence within the previous 72 hours. The controlled buy had been set up based on a tip from a confidential informant and had been effected by the informant. I R.Doc. 45.

The affidavit in support of the application for the search warrant contained no information regarding the credibility of the confidential informant other than what might be inferred from the fact that the buy had been completed based on his original tip. The informant had reported that the seller of the cocaine, then identified only as "Quick," [1] had stated that he had more cocaine available at his residence. The affidavit said that based

on this incident and the affiant's experience as a police officer, which was not described with any specificity, it was likely that the residence contained, in addition to cocaine, "items used as cutting agents, paraphernalia, packaging material, scales, . . . ." and so forth. *Id.*

The warrant was executed by the Wichita Police Department on October 4, 1993, at about 9:13 p.m., one day after it had been issued. In a hearing on the defendant's motion to suppress, evidence was presented concerning the entry and search. Three witnesses were called by the defense, all of whom had been present at the time. These witnesses testified that they heard nothing until the police simultaneously broke in the back door and broke the kitchen window. II R.Doc. 115 at 9–13, 53–54, 74–75. Defendant's evidence was that the doorbell could be heard in any room in the house and similarly a knock on either the front or back door could be heard from anywhere in the house. None of the witnesses heard either a knock or any announcement by the officers.

The lead detective on the search team testified on behalf of the government at the suppression hearing. His testimony was that eight or nine officers participated in the search, they began yelling "Police, search warrant" as they approached the house, and on trying the back door, they found it locked. The police heard a number of footsteps inside but none seemed to be coming to the door, so they used a battering ram to break it in. The detective did not know if anyone rang the doorbell and doubted that the officer at the back door knocked before using the ram to enter forcibly.

Ten adults and one infant were in the house when the police entered. Three pistols and a sawed-off shotgun were found in the house. The defendant later admitted that the pistols were his and said they were legally registered in his name. One loaded pistol was found in plain view on a dresser in the bedroom in which defendant, his girl-

---

* The Honorable James O. Ellison, Senior United States District Judge for the Northern District of Oklahoma, sitting by designation.

1. In his trial testimony, defendant acknowledged that he was known by the nickname "Little

Quick" or just "Quick." No evidence regarding the controlled buy was introduced at the trial, however.

friend and her infant were when the search began. The loaded shotgun was on the floor in this room. In the same room the police also found ammunition, several small bags of marijuana, packaging material, a digital scale, and a pager. Cocaine was found in two other rooms.

The occupants were subjected to pat-downs initially. Then the defendant consented to a search of his person. Three small bags of crack and some $600 in cash were found on defendant. A very small "rock" of crack and some marijuana were found in a search of Mr. Smith's co-defendant, David Vernon. At trial defendant and his girlfriend denied that the police had found the three bags of cocaine in his pockets. Defendant said that the cash had been given to him by his father to help with ordinary bills, something his father did regularly.

After his arrest defendant agreed to be questioned. He admitted ownership of the three pistols and said that he acquired the guns because he was living in the territory of a gang called the VLBs and had been threatened by them several times. Defendant also said that the drugs had been delivered to his house just before the raid by members of the VLBs who had demanded that he sell drugs for them since he was living in their territory. Defendant's similar testimony at trial was the basis for a coercion or duress defense asserted by defendant.

Additional facts will be set out below as necessary for discussion of the issues raised.

## II

Defendant first challenges the district court's denial of his motion to suppress evidence based on alleged insufficiencies in the affidavit supporting the search warrant and on the alleged overbreadth of the warrant.

■ In reviewing the denial of a motion to suppress, we accept the district court's findings of fact unless they are clearly erroneous. *United States v. Wicks,* 995 F.2d 964, 968 (10th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 482, 126 L.Ed.2d 433 (1993). We view the evidence in the light most favorable to the ruling below. *Id.* In determining whether a search warrant was supported by probable cause, considerable deference is given to the initial determination, unless the affidavit provides no substantial basis for probable cause. *United States v. $149,-442.43,* 965 F.2d 868, 872 (10th Cir.1992). The ultimate question whether Fourth Amendment rights have been violated is an issue of law reviewed de novo. *Wicks,* 995 F.2d at 969.

### A

■ Defendant challenges the affidavit supporting the search warrant on several grounds. First, he argues that the information was stale, the controlled buy having been completed about 72 hours before the search warrant was sought. Defendant acknowledges that the determination of timeliness depends not merely on the passage of time but on the nature of the criminal activity, the length of the activity, and the nature of the property to be seized. *United States v. Snow,* 919 F.2d 1458, 1460 (10th Cir.1990).

■ Defendant says that unlike in *Snow,* here there was no ongoing investigation and no reason to think the drug dealing was continuing. Although it is true that in the instant case there was no ongoing investigation and no specific evidence that Smith's drug-dealing activities had been continuing for an extended period, we think that the mere passage of 72 hours did not make the information stale. In determining whether probable cause has been established to justify the issuance of a search warrant, we apply a common-sense standard. *Wicks,* 995 F.2d at 972. From the successful completion of the controlled buy, and the evidence that defendant had additional amounts of cocaine in his residence at the time of the informant's purchase, it was reasonable to infer that evidence of drug dealing could still be found. We hold that Smith's staleness argument is without merit.

### B

■ Second, defendant argues that the information from the informant was uncorroborated. He contrasts the facts in this case with those in *United States v. $149,442.43, supra,* which also involved a search warrant

issued after a controlled buy had been completed. In that case, the supporting affidavit additionally stated that the informant had provided accurate information in the past, and the police had also obtained independent corroborating evidence, including a second reliable informant.

■ In our view the additional information supporting the informant's credibility in that case, while certainly bolstering the showing of probable cause, was not critical. The standard for determining the credibility of an informant is the totality of the circumstances, and we have held that when the reliability of an informant has been corroborated by extrinsic information, it is unnecessary to otherwise establish the informant's credibility. *United States v. Sturmoski,* 971 F.2d 452, 457 (10th Cir.1992). We therefore hold that the successful completion of the controlled buy, as specifically described in the supporting affidavit here, was sufficient to establish the reliability of the informant.

### C

■ Next, defendant argues that the warrant was overly broad, noting that the only basis for the allegation that evidence other than cocaine was likely to be found was the affiant's experience as a police officer. This was insufficient, defendant argues, because the affiant did not say how long he had been a police officer or whether he had any experience at all in drug cases, in contrast to the type of statements that have been found sufficient in other cases.

■ Under the Fourth Amendment, two requirements are established for search warrants: probable cause supported by an oath or affirmation, and a particular description of the place, persons and things to be searched for and seized. *Wicks,* 995 F.2d at 972. Viewing defendant's contention in this light, we perceive that this argument is actually focused on lack of probable cause to support the conclusion that items of the type described would likely be found. Defendant actually makes no contention that the descriptions were overly general or vague. In light of our holdings in cases such as *Wicks; United States v. Sullivan,* 919 F.2d 1403,

1424 & n. 31 (10th Cir.1990); and *United States v. Harris,* 903 F.2d 770, 774–75 (10th Cir.1990), we believe that any such argument clearly would be unavailing.

The government responds to this contention with a circular argument. Its response is that the officer's experience in drug cases can be inferred from his description of the items to be seized. The government also notes that all of the items listed were actually found in the search. This reasoning approaches an argument that the validity of the warrant may be determined from the results of its execution—a wholly untenable bootstrapping position. *See Maryland v. Garrison,* 480 U.S. 79, 85, 107 S.Ct. 1013, 1017, 94 L.Ed.2d 72 (1987) ("[T]he discovery of contraband cannot validate a warrant invalid when issued...").

■ Notwithstanding the government's failure to counter defendant's argument convincingly, we are not persuaded that the warrant was deficient. Unquestionably it would be sounder practice for the police officer to describe the basis for the conclusion that items described in a search warrant are reasonably likely to be found based on the evidence supporting the application for the warrant. In several cases we have relied on officers' statements regarding their experience and training in drug cases to rebuff challenges to search warrants. *See, e.g., Sullivan,* 919 F.2d at 1423; *United States v. $149,442.43,* 965 F.2d at 872, 874. Nevertheless, we do not doubt that the state judge could reasonably infer from the fact that Smith had sold cocaine from his residence within the previous 72 hours that items such as those listed could reasonably be expected to be found on the premises. Hence we hold that defendant has failed to show error in the denial of his motion to suppress, based on the claimed deficiencies in the warrant and supporting affidavit.

### III

■ Defendant contends further that the evidence should have been suppressed because the manner of execution of the warrant violated the Fourth Amendment, arguing that the "knock and announce" requirement

is mandated by the Fourth Amendment and was not adhered to in this case. On this issue we ordered supplemental briefs in light of the recent decision in *Wilson v. Arkansas,* — U.S. ——, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995), and they have been considered.

In *Wilson,* the Court granted certiorari to consider the limited question whether the common law knock and announce principle "forms a part of the Fourth Amendment reasonableness inquiry." *Id.* at ——, 115 S.Ct. at 1916. In holding that the knock and announce principle is included within the Fourth Amendment reasonableness inquiry, the Court said that

> although a search or seizure of a dwelling might be constitutionally defective if police officers enter without prior announcement, law enforcement interests may also establish the reasonableness of an unannounced entry.

*Id.* at ——, 115 S.Ct. at 1919. However, the Court specifically declined to reach any issues regarding the balancing of valid law enforcement interests with the Fourth Amendment rights enjoyed by the public, instead leaving "to the lower courts the task of determining the circumstances under which an unannounced entry is reasonable under the Fourth Amendment." *Id.*

Although the principle is commonly referred to as "knock and announce," the Court's holding in *Wilson* requires only an announcement. Similarly the federal statute, 18 U.S.C. § 3109, imposes only the requirement that the officer give "notice of his authority and purpose." Although the statute is not applicable to the search here by city police pursuant to a search warrant issued by a state court, we have noted that the statute is "grounded" in the Fourth Amendment. *United States v. Ruminer,* 786 F.2d 381, 383 (10th Cir.1986); *see United States v. Baker,* 638 F.2d 198, 202 and n. 7 (10th Cir.1980). We have carefully reviewed *Wilson* and find nothing therein that suggests that our decisions under § 3109 infringe upon rights guaranteed by the Fourth Amendment. Consequently, we think it clear that our cases under § 3109 can provide valid guidance on the constitutional claim defendant makes. *See United States v. Gatewood,* 60

F.3d 248, 250, n. 2 (6th Cir.1995) (Jones, J., dissenting). We thus proceed to analyze this issue in light of the facts as determined by the district court and our previous rulings on the Fourth Amendment's requirements.

Defendant contends that the officers gave no notice of their presence before entering and that no time was given for the residents to admit the officers voluntarily. Defendant's argument is not supported by the facts as found by the district court, which findings must be accepted unless they are clearly erroneous. Defendant does not specifically contend that the findings are clearly erroneous, nor could such a contention be convincing since the court based the findings on credibility determinations after hearing the evidence of both parties. The district judge expressly found that the defendant's witnesses were not credible and that the police officer's testimony was. That testimony established that the officers did announce their presence.

Specifically Officer Fettke, who was the officer in charge of the operation, testified that an unlocked screen door to the back porch was first opened; beginning at that time, if not before, several of the officers "began hollering 'Wichita Police Department, search warrant'" and continued to do so as the inner door was found to be locked, the battering ram was swung, and the entry was made. II R. at 94. During the interval between reaching the door and forcing it open, which Fettke estimated to be probably 45 seconds in duration, *id.* at 110, the officers heard "many footsteps" in the house "like stirring or running or trying to do other things inside the house." *Id.* at 96. The district court found, based on the testimony, that "the noises Detective Fettke heard coming from within the house were consistent with activities other than an occupant innocently approaching the door." I R.Doc. 60 at 9.

In his supplemental brief at 3, defendant argues that the officers "did not knock, ring the door bell, or take any other action which can even remotely be interpreted as requesting admittance." We do not agree. To the contrary we think that the average citizen would understand the officers' statements as

a command to open the door. We think, then, that this case, like *United States v. Knapp,* 1 F.3d 1026, 1030–31 (10th Cir.1993), turns on the issue whether the officers were constructively refused admittance and so were justified in entering the home forcibly.[2] In *Knapp,* we held that the officers were justified in concluding that the defendant was refusing to admit them voluntarily when they received no response after an interval of ten to twelve seconds. Similarly we conclude that in this case the officers were constructively refused admittance and that the forcible entry was therefore justified.

In his supplemental brief, defendant attempts to distinguish *Knapp* by stating that in the instant case the announcement and the forced entry occurred simultaneously. Although we do not have the benefit of specific trial court findings on this point, the court did expressly determine that the officer's testimony was credible. That testimony included a statement that an interval of "probably 45 seconds" elapsed from the time that the officers had tried the door and found it locked until the door was struck with the battering ram. II R.Doc. 115 at 110. Several officers had been loudly announcing their presence from the time that they first approached the house until the entry began.

Viewing the record most favorably to the ruling below, we find no constitutional violation. *See Knapp,* 1 F.3d at 1030–31; *Ruminer,* 786 F.2d at 383–84 (collecting cases on the validity of entries made after brief time intervals from the announcement of the officers' presence and upholding a search conducted where officers waited five to ten seconds before entering).

## IV

■ Over defense objections, the government was allowed to introduce in evidence three photographs of the defendant which had been seized during the search. These photos were admitted during cross-examination of defendant by the prosecutor, the court having ruled at the beginning of the trial that the pictures could not be used during the government's case-in-chief. Exhibit 15A shows the defendant alone, sitting with several firearms on his lap.[3] Exhibit 15B shows defendant posed with five of his friends, and each person in the photo is holding a gun. Exhibit 15D shows defendant and three other persons; defendant and one of the other persons shown are making hand signals which defendant admitted were "gang signs." In this photo defendant is wearing a shirt with the letters "CMG" on it. He testified that this stood for "Cash Money Gangsters," a group with which he associated and which "call they [sic] self a gang" but which he said was not like other gangs that "go out and do stuff," at least to his knowledge. He denied being a member of this group.

Defendant contends that the district judge erred in admitting the photos in evidence, contending that the photos had no probative value whatsoever and that they served to inflame the jury, thus prejudicing his defense unfairly. Although not cited by defendant in his brief, this argument is clearly based on Fed.R.Evid. 402 and 403. The government contends that the photos were probative as impeachment, citing the district court's rationale that the evidence of gang affiliation bore directly on Smith's credibility because he had denied being a gang member, and that the photos depicting Smith with the collection of firearms were relevant to the credibility of his testimony that he possessed the guns only for protection from the VLB gang.

■ We review the district court's rulings on admission of evidence under Fed. R.Evid. 403 for abuse of discretion. *United States v. Harrison,* 942 F.2d 751, 759 (10th Cir.1991). We find that these photos had probative value for impeachment purposes. We do not think that the ruling on unfair prejudice was an abuse of discretion, especially considering that the jury had already heard testimony about the presence of nu-

---

2. If we were to decide this issue in Smith's favor, however, that would not end the matter. We would then have to determine whether exigent circumstances justified the forcible entry. We feel that the police announced their presence and purpose, and that they were constructively de-

nied admission; therefore, we do not reach any other issue.

3. Good reproductions of the exhibits appear in Appellant's Addendum A to his Brief on Appeal.

merous firearms in the house at the time of the raid, including loaded weapons in the room occupied by defendant where an infant was also present. The trial court showed appropriate caution in hearing the arguments on these exhibits, in restricting the government to using the exhibits only for impeachment, and in instructing the jury about the limited relevance of the photos immediately after their admission. We find no abuse of discretion in the ruling.

## V

■■■■■ Defendant maintains that the evidence was insufficient to support the jury's verdict of guilty on the charge of using or carrying firearms in connection with a drug trafficking offense. In reviewing the sufficiency of the proof, we must determine whether there is sufficient substantial evidence, direct and circumstantial, and reasonable inferences that can be drawn therefrom, which when viewed in the light most favorable to the verdict would permit a reasonable jury to find the defendant guilty beyond a reasonable doubt. *United States v. Sullivan,* 919 F.2d 1403, 1431 (10th Cir.1990).

The applicable statute provides in relevant part:

Whoever, during and in relation to any crime of violence or drug trafficking crime ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years....

18 U.S.C. § 924(c)(1). Defendant acknowledges that we have held that a defendant "uses" a firearm for purposes of the statute when the firearm is readily accessible, is an integral part of the criminal undertaking, and increases the likelihood that the criminal undertaking would succeed. *United States v. Hall,* 20 F.3d 1084, 1088–89 (10th Cir.1994). He concedes that the firearms were readily accessible but contends that the government failed to prove the remaining elements.

Citing *Hall,* defendant says that to establish the necessary nexus between the drug trafficking offense and the firearms, the gov-

ernment must prove more than simply the presence of a firearm in a house containing drugs, drug paraphernalia and cash. Brief of Appellant at 25. *Hall* did hold, 20 F.3d at 1089, that mere proof that a weapon was present in a defendant's residence was insufficient to prove he had ready access to the firearm. However, we have held that it is permissible for the jury to infer from the proximity of the weapon to drugs that the weapon was used in furtherance of a drug trafficking enterprise where the proof connected the defendant to the vehicle or dwelling involved. *United States v. Coslet,* 987 F.2d 1493, 1495 (10th Cir.1993); *United States v. Hager,* 969 F.2d 883, 889 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 437, 121 L.Ed.2d 357 (1992); *United States v. Parrish,* 925 F.2d 1293, 1298 (10th Cir.1991). Thus, we must determine whether the evidence in this case would support the inference of guilt, consistent with the premise that something more than the mere presence of the weapons in the same house in which the drugs were found is required.

We believe that sufficient evidence to support the inference that the weapons were used in furtherance of drug activities was presented. Unlike *Hall,* where the gun was in an upstairs closet removed from the evidence of drug dealing, here the weapons all were in close proximity to the drugs. In several cases we have found proximity to be sufficient to support jury inferences that the weapons were used in connection with the drug offense. *See, e.g., Hager,* 969 F.2d 883 (gun found in boot in the room in which drugs were found); *see also Hall,* 20 F.3d at 1088–89 (noting numerous cases turning on proximity of guns and drugs). Moreover, here the evidence included an admission by the defendant that the guns were used to protect drug trafficking. Trial Exhibit 16 (tape recorded statement given by defendant after his arrest and after waiver of his *Miranda* rights).

■■■■■ To counter this evidence, defendant argues two points. He relies on the fact that the officers who executed the search warrant testified that no one was holding or using the weapons when they entered. We find Smith's reliance on this undisputed fact to be

unpersuasive. The statute does not require the government to prove that the defendant brandished, displayed, or fired the weapons. *United States v. Hager,* 969 F.2d at 888. Instead, we have held that "the evidence must prove that the defendant intended the weapon to be available for use during the drug transaction." *United States v. Conner,* 972 F.2d 1172, 1174 (10th Cir.1992). We have held that the government satisfies this standard if its proves that

> The circumstances surrounding the presence of a firearm in a place where drug transactions take place suggest that it was strategically located so as to be quickly and easily available for use during such transaction[s].

*Id.* (quoting *United States v. Feliz–Cordero,* 859 F.2d 250, 254 (2d Cir.1988)). We hold that the government's evidence was sufficient under this standard, consistent with cases such as those cited in *Hall,* 20 F.3d at 1088–89.

▮ Defendant also points to his testimony that he kept the guns only because of the threats made by the VLBs. Defendant argues that his statement after his arrest that the guns were used for protection of the drugs (which the jury heard because the entire tape of the post-arrest interview was played at trial) was not a voluntary statement but the product of the detective's leading question, as shown by his correcting statement made immediately after that statement.

This argument simply ignores the fact that defendant's credibility was properly left for the jury to decide. Obviously, the jury could properly decide that Smith's original statement was true and that his attempt to withdraw and explain the statement was not. Therefore, Smith's testimony of another motive to explain his gun possession is plainly insufficient to require reversal.

> It is reasonable, we think, if an operable firearm is found in close proximity to a room or rooms in which drug distribution, processing, or storage occurs, for the factfinder to conclude that the defendant knew the gun was there and intended it to be available for use in connection with the predicate offense. Indeed, *so long as one purpose in situating the weapon nearby was to protect the narcotics enterprise, that need not have been defendant's sole purpose.* In sum, even if a firearm is not instantly available or exclusively dedicated to the narcotics trade, a sufficient nexus may exist to support a finding that it was "used" during and in relation to a drug trafficking crime.

*Hager,* 969 F.2d at 889 (emphasis added) (quoting *United States v. Hadfield,* 918 F.2d 987, 998 (1st Cir.1990), *cert. denied,* 500 U.S. 936, 111 S.Ct. 2062, 114 L.Ed.2d 466 (1991)).

Therefore, we find no error in the district court's denial of defendant's motion for judgment of acquittal respecting the firearms charge.

## VI

▮ Defendant next argues that his conviction should be reversed because the district judge refused to instruct the jury on his theory of defense—that he was in possession of the cocaine only because he feared that his life was in danger due to the threats by the VLBs and their demands that he sell drugs.

▮ We review jury instructions as a whole under the de novo standard. It is reversible error for the trial court to refuse to instruct the jury adequately on any theory of the defense supported by the law and the evidence. *United States v. Scafe,* 822 F.2d 928, 932 (10th Cir.1987). "Whether a defendant has made a threshold showing as to each element of the duress defense is a question of law and is reviewed de novo." *United States v. Williams,* 791 F.2d 1383, 1388 (9th Cir.), *cert. denied sub nom. Sears v. United States,* 479 U.S. 869, 107 S.Ct. 233, 93 L.Ed.2d 159 (1986). In conducting this review we must give full credence to defendant's testimony, *id.,* and we note that the district court in this case correctly did so. IV R. 555–59.

▮ To be entitled to an instruction on coercion the defendant must show: an immediate threat of death or serious bodily injury; a well-grounded fear that the threat will be carried out; and no reasonable opportunity to escape the threatened harm. *Unit-*

*ed States v. Merchant,* 992 F.2d 1091, 1096 (10th Cir.1993); *United States v. Scott,* 901 F.2d 871, 873 (10th Cir.1990). In the instant case, the district court refused to instruct on the coercion defense, finding that defendant had failed to offer proof of no opportunity to escape. It is fundamental that the defendant's evidence must be sufficient as to all elements of any affirmative defense for him to be entitled to a jury instruction on the theory. Accordingly, in *Merchant* and *Scott* we upheld the district courts' refusals to instruct on the defense of coercion when the defendants' evidence failed to establish the absence of any reasonable opportunity to escape the threatened harm.

Defendant argues that the district court's decision constituted an impermissible ruling on a genuine issue of fact. Defendant introduced evidence of threats by the VLBs which began several months before his arrest and continued to the actual day of the arrest. According to defendant's testimony, the VLBs considered the area in which he was living to be their territory and had warned him that he should leave. Later, they had told him that if did not leave, he would have to sell drugs for them. He said that the gang had threatened him directly and also suggested that his young child might be harmed if he did not do as they directed. Besides these verbal threats, defendant testified that on one occasion a shot was fired from a passing car while he and a friend were standing outside his home. His companion fired back at the car. Also, about five days prior to his arrest, defendant was accosted by some VLBs, and one of them pulled out a knife and cut Smith's finger. Smith went to a hospital emergency room to have the cut sutured but lied about what caused the injury because he did not want to be involved with the police at that time.

Defendant further testified that on the day of his arrest, some of the gang members had come to his house and repeated the threats. They also told him to meet them later that day at a liquor store and to bring with him his scales. Smith went to the liquor store and met some of the VLBs as they had told him to do. He also delivered his scales to them as requested. He testified that at that meeting he was told that some of the gang members would come to his house that afternoon. Significantly, Smith testified that at that time he expected the VLBs would be bringing drugs with them which they would expect him to sell for them. Defendant was not at his home when the gang members came, but another witness said one of these men was carrying a sack and went into defendant's bedroom. Defendant further testified that he returned home some time later and went directly to bed, and thus did not know that the drugs had been delivered until the police found drugs during the search.

Defendant's theory was that he had no opportunity to avoid the illegal conduct and escape the threats because the police arrived as soon as he learned the drugs had been delivered. He contends that he had never agreed to sell drugs for the gang and cites his testimony at trial that he would have called the police as soon as he discovered that the drugs had actually been delivered but that he had no chance to do so under the circumstances. Until the drugs had been delivered, he maintains, there was no certain harm from which he needed to escape.

Although we disagree with the conclusion which defendant draws from this evidence, we note that each of the facts cited above is supported by evidence at the trial. However, we find critical the one fact which defendant omits from his review of the evidence—his admission that he was expecting the VLBs to deliver drugs to his residence just as he claimed they did. Defendant offers no reasonable explanation for his failure to contact the authorities in time to prevent his being forced to break the law. We hold that, as in *Scott,* defendant had a "reasonable legal alternative to undertaking the acts" but failed "to avail himself of the readily accessible alternative of contacting law enforcement officials...." 901 F.2d at 874.

■ In essence defendant's argument comes down to this: that he was being threatened with great harm if he did not perform an illegal act, but he was justified in not seeking to escape from this coercion until he had actually been compelled to do the act (i.e., to possess the cocaine). Under our precedents, however, it is clear that the coer-

cion defense can not be so liberally applied. *Shannon v. United States,* 76 F.2d 490, 493 (10th Cir.1935) ("One who has full opportunity to avoid the act without danger ... cannot invoke the doctrine of coercion and is not entitled to an instruction submitting that question to the jury."); *cf. United States v. Lewis,* 628 F.2d 1276, 1279 (10th Cir.1980), *cert. denied,* 450 U.S. 924, 101 S.Ct. 1375, 67 L.Ed.2d 353 (1981) (similar holding with respect to defense of necessity).[4] Thus, we hold that one who, like Smith, has a reasonable opportunity to avoid both the danger and the illegal conduct at a time when, by his own admission, he considered that the object of the coercion—his compelled commission of a crime—was imminent, must take the opportunity to avoid the situation. If he does not, he cannot say that he was forced against his will to violate the law.[5]

In sum, we agree with the district court that Smith's evidence, even when given full credence, was insufficient to entitle him to an instruction on his theory of coercion or duress. His evidence made no showing or explanation why he did not seek the assistance of the police to extricate himself from the alleged dilemma.

### VII

 Finally, defendant maintains that the provisions of the Sentencing Guidelines which treat crack cocaine much more harshly than cocaine in powder form are unconstitutional because of their impact on African–Americans. He concedes that this argument was rejected in *United States v. Thurmond,* 7 F.3d 947, 951–53 (10th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1311, 127

L.Ed.2d 661 (1994), but asks that this ruling be reconsidered and rejected. This panel, however, cannot overrule the court's existing precedent absent en banc reconsideration or a superseding contrary decision by the Supreme Court. *In re Smith,* 10 F.3d 723, 724 (10th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 53, 130 L.Ed.2d 13 (1994).

Accordingly, the judgment and sentence are **AFFIRMED.**

---

**4.** Defendant cites *United States v. Yarbrough,* 852 F.2d 1522, 1541 (9th Cir.), *cert. denied,* 488 U.S. 866, 109 S.Ct. 171, 102 L.Ed.2d 140 (1988), which stated that an instruction should be given where there is "some foundation in the evidence [for a defense], even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility." Nevertheless, we note that our holdings in cases like *Scott, Merchant, Lewis,* and *Shannon* are representative of a widely prevailing judicial view. *See Lewis,* 628 F.2d at 1279 (citing *The Diana,* 7 Wall. (74 U.S.) 354, 19 L.Ed. 165 (1869); *see also* J. Dressler, *Exegesis of the Law of Duress: Justifying the Excuse and Searching For Its Proper Limits,* 62 S.Cal.L.Rev. 1331, 1331–32 (1989).

**5.** At trial, Smith asserted that he had not notified the police of the earlier threats by the VLBs nor of the incident in which his finger had been cut by one of the gang members because of his belief that the police would not respond to such problems. Although Smith does not make this argument on appeal, we note the similarity between Smith's testimony on this point and that of the defendant in *Scott,* which we found to be "nothing more than an amorphous belief ... that police would not act ... [which] was neither substantiated by the evidence nor defined as to its scope and coverage." 901 F.2d at 874. Thus, this argument would be unavailing in any event.