**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**April 28, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

_____

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | |
| v. | No. 24-6244 |
| | (D.C. No. 5:24-CR-00015-HE-1) |
| SIMON VELAZQUEZ HERNANDEZ, | (W.D. Okla.) |
| Defendant - Appellant. | |

_____

**ORDER AND JUDGMENT***

_____

Before **ROSSMAN**, **MURPHY**, and **FEDERICO**, Circuit Judges.

_____

Simon Velazquez Hernandez[1] appeals his conviction after a jury trial

for possessing methamphetamine with intent to distribute in violation of 21

U.S.C. § 841(a)(1). He argues the district court erred by refusing to admit

certain statements at trial in the form of video recordings under Federal

Rule of Evidence 106. Because Mr. Hernandez did not preserve this issue

---

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and 10th Circuit Rule 32.1.

[1] We refer to the Appellant as Mr. Hernandez. He testified that he prefers this name.

before the district court, we review only for plain error. Exercising

jurisdiction under 28 U.S.C. § 1291, we affirm.

# I

## A[2]

Early one morning in December 2023, Oklahoma City Police Sergeant

Charles Seale stopped Mr. Hernandez for speeding on the I-40. He grew

"suspicious fairly quickly into the stop" based on Mr. Hernandez's

inconsistent "story" and items he saw in the car, including a radar detector.

RIII.43–47, 51, 68. Sergeant Seale asked Mr. Hernandez to exit the vehicle

and placed him in the back seat of his police car. He then "conduct[ed] [his]

law enforcement checks" and summoned a canine unit to "do a sniff" of Mr.

Hernandez's car. RIII.46. The dog "pretty quickly alerted to the odor of

narcotics[.]" RIII.47. Mr. Hernandez ultimately consented to a search of the

car. Officers found thirty-eight bundles of methamphetamine in the factory

void of the center console.[3]

---

[2] "Our summary of the factual background is based on the evidence presented at trial, viewed in the light most favorable to the verdict." *United States* v. *Dermen*, 143 F.4th 1148, 1164 n.1 (10th Cir. 2025).

[3] The "net weight" of the methamphetamine was "just under" seventeen kilograms and had an approximate wholesale value of "just over" $54,000. RIII.102–03, 105. At trial, the parties stipulated the bundles "contain[ed] a substance with a net weight, excluding packaging, of 16,907

(continued)

Sergeant Seale arrested Mr. Hernandez and drove him to the police station. During the transport, Mr. Hernandez, seated in the backseat, became "very emotional" and expressed concern "that his mother, who is in Mexico, would be harmed." RIII.70, 72. Sergeant Seale's rear-facing dash camera recorded his statements. At the police station, Mr. Hernandez waived his *Miranda*[4] rights and agreed to a post-arrest interview with Detective Thomas Snyder. The interview, conducted through a telephone "language line" interpreter, lasted approximately ninety minutes and was recorded.[5] RIII.81–83; *see* Def. Ex. 1 (the Post-Arrest Interview Video).

Mr. Hernandez again "became emotional" during the interview and cried at least nine times. RIII.92. He told Detective Snyder that an individual named "Primo" called him earlier that month about two drug delivery "jobs." RIII.83. According to Mr. Hernandez, Primo—who lived in Mexico—threatened to harm his mother if he did not complete the

---

grams[,]" and that the substance was "confirmed to be methamphetamine with a purity of at least 98 percent." RIII.114.

[4] *Miranda* v. *Arizona*, 384 U.S. 436 (1966).

[5] Detective Snyder testified the City of Oklahoma City "has a company that they contract out to that is a language line[,]" and this "language line handles several different languages." RIII.81. In this case, Detective Snyder "called the language line . . . , g[a]ve them [his] patrol number, . . . and then ask[ed] them for a Spanish interpreter." RIII.81.

deliveries.[6] Primo knew where in Mexico Mr. Hernandez's mother lived. Under Mr. Hernandez's account of the first "job," an unidentified individual approached him at a Walmart in Moreno Valley, California, placed a toolbox full of drugs in his car, and instructed him to deliver the toolbox to Little Rock, Arkansas. Mr. Hernandez successfully completed the delivery. He told Detective Snyder that he was provided $1,000 for his hotel, gas, and food. RIII.85.

Mr. Hernandez claimed Primo then called him about a second "job." The same unidentified individual again met Mr. Hernandez at the Walmart in Moreno Valley. This time, the drugs "were handed to [Mr. Hernandez]," and he "placed them in . . . a void" in the vehicle console.[7] RIII.86. Mr. Hernandez told Detective Synder that, as with the first "job," he agreed to complete the second delivery only because Primo "threatened his mom[.]" RIII.87. The second delivery ended in Mr. Hernandez's arrest in this case.

---

[6] Mr. Hernandez's trial testimony differed from what he told Detective Snyder on this front. He testified that Primo did not threaten to harm his mother until the second delivery.

[7] The trial evidence is inconsistent on this point. Mr. Hernandez testified that the unidentified person—a "Chinese guy"—and "his guys" were the ones responsible for concealing the drugs in the car. RIII.125, 132–133. He conceded during cross-examination that his "story . . . about who loaded the meth into [his] rental car is drastically different than what [he] told Detective Snyder" during the post-arrest interview. RIII.134.

4

**B**

A grand jury indicted Mr. Hernandez on one count of conspiracy to possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846; and one count of possession with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Mr. Hernandez asserted the affirmative defense of duress. To that end, he planned to tell the jury that he completed the drug deliveries because Primo threatened his mother. The government later dismissed the drug conspiracy charge and chose to prosecute Mr. Hernandez only for possession with intent to distribute.

**1**

Mr. Hernandez's trial lasted two days. Just before the government's case, a dispute arose about whether the jury could view the Post-Arrest Interview Video. Defense counsel wanted to show the jury the entire recording except for a small portion where "[Detective] Snyder asks Mr. Hernandez if he can have his phone to do a download on it, and Mr. Hernandez says no." RIII.28–29.

The government objected because "[t]he entire thing is hearsay." RIII.29; *see* RIII.30 (prosecutor explaining the Post-Arrest Interview Video

5

is "an out-of-court statement" offered "to prove the truth of" the matter asserted). The Post-Arrest Interview Video could come into evidence, the prosecutor observed, only if the *government* offered it "because it's an opposing party's statement." RIII.30. That said, the government "intend[ed] to ask [Detective Snyder] about the interview and about what he perceived during the interview," but it would not "play the video for the jury." RIII.29. In response, defense counsel insisted the Post-Arrest Interview Video was admissible because it was Mr. Hernandez's "statement." RIII.29. And Mr. Hernandez's "statement" was "an important piece of evidence for the jury to see[,]" defense counsel argued, because "[i]t's the first time he tells the story." RIII.30. The district court sustained the government's objection. To the extent the Post-Arrest Interview Video was "offered by the defendant, rather than offered against the defendant," the district court ruled, "it doesn't come within the exception" to the hearsay rule and was inadmissible. RIII.30; *see* FED. R. EVID. 801(d)(2)(A) (stating that a statement is not hearsay if it is "offered against an opposing party and . . . was made by the party in an individual or representative capacity").

**2**

The case proceeded to trial. The government called three witnesses: Sergeant Seale, Detective Snyder, and Sergeant Chad Cook.[8] Sergeant Seale testified about the traffic stop, search, and arrest. During his testimony, the government played body camera and dash camera footage from the traffic stop. As relevant to this appeal, the government showed rear-facing dash camera footage of Mr. Hernandez in the backseat of Sergeant Seale's police car. The government's dash camera footage, which spans a minute and a half, shows Mr. Hernandez's initial reaction once Sergeant Seale informed him drugs were found in the car.

On cross-examination, Sergeant Seale agreed that Mr. Hernandez was "very emotional" on the way to the police station. RIII.70. He also told the jury that Mr. Hernandez made "a couple of statements[,]" but "[s]ome of them were kind of hard to understand because he was crying[.]" RIII.70. Defense counsel then moved to admit a subsequent portion of Sergeant Seale's rear-facing dash camera footage—spanning two minutes and twenty-four seconds—which depicted Mr. Hernandez during his transport to the police station. *See* Def. Ex. 2 (the Dash Camera Segment). Mr.

---

[8] The government noticed Sergeant Cook as an expert in "the patterns and practices of drug trafficking organizations." RI.23. His testimony is not relevant to this appeal.

7

Hernandez cries throughout the Dash Camera Segment and makes a comment to Sergeant Seale about fearing for his mother's safety in Mexico.

The government objected on hearsay grounds. Defense counsel insisted the Dash Camera Segment was admissible because it was "an important piece of evidence" and would allow "the jury to see how emotional Mr. Hernandez was[.]" RIII.71. The district court concluded the Dash Camera Segment was "hearsay," but suggested defense counsel could use the video to impeach Sergeant Seale if he was "not testifying accurately[.]" RIII.71. The district court rejected defense counsel's follow-up request to "play the video without the audio" because that did not "make[] it less hearsay." RIII.71.

On cross-examination, defense counsel asked Sergeant Seale what Mr. Hernandez said during the transport to the police station. The district court overruled the government's hearsay objection and allowed Sergeant Seale to tell the jury about Mr. Hernandez's comments. Sergeant Seale testified Mr. Hernandez "made a comment about his mother" and "was crying." RIII.72. Although Sergeant Seale initially stated he "wasn't sure exactly what [Mr. Hernandez] was saying[,]" he ultimately confirmed Mr. Hernandez "appeared to be in fear of—that his mother, who is in Mexico, would be harmed." RIII.72.

Detective Snyder testified next. He described the post-arrest interview, Mr. Hernandez's two cross-country drug deliveries at the behest of Primo, and Primo's threats to harm Mr. Hernandez's mother. The government did not play any portion of the Post-Arrest Interview Video. On cross-examination, Detective Snyder agreed the recording was "the best evidence" the jury could see "of what Mr. Hernandez said, the questions [he was] asked . . . , and what the interpreter said." RIII.89. He also testified Mr. Hernandez got emotional "several times" and "cried through the whole [interview] . . . whether [they] were talking about his mother or whether [they] were talking about the narcotics." RIII.92. When pressed by defense counsel, Detective Snyder further agreed "it would be speculation" on his part "as to whether [Mr. Hernandez] was crying because he got caught or . . . because his mother[] [was] in danger." RIII.92–93.

Mr. Hernandez testified in his defense through a court interpreter. He described Primo's threats, explaining he made the decision to deliver the drugs out of fear for his mother's life. Mr. Hernandez believed his mother "would be seriously injured or killed" if he did not do what Primo asked and he had no "other option other than to break the law[.]" RIII.130. The defense called no other witnesses.

**3**

The admissibility of the Post-Arrest Interview Video cropped up again when the parties conferred with the trial judge in chambers to finalize jury instructions. Defense counsel "formally moved" to admit the Post-Arrest Interview Video "to preserve the issue" for appeal. RIII.167. The government reasserted its "same hearsay objection." RIII.168. In response, the district court asked defense counsel whether he had "[a]ny new rationale" for admission that had not "already [been] considered" and rejected by the district court. RIII.168. Defense counsel said no. The district court said Mr. Hernandez's "objection [was] saved." RIII.168.

The district court then instructed the jury on the relevant law, including Mr. Hernandez's affirmative duress defense.[9] During closing argument, the government referenced Sergeant Seale's rear-facing dash camera footage. The prosecutor suggested Mr. Hernandez reacted with knowing acceptance rather than surprise when the drugs were discovered in his car: "[W]as the defendant surprised? Did he act like he didn't know what was going on? No. He bowed his head, he accepted it. He knew what was in his car and you can see it on his face." RIII.205. Defense counsel then

---

[9] The jury received an instruction titled, "Coercion or Duress." RI.237 (text formatting altered). This instruction set forth the elements of the duress defense under Tenth Circuit law. No party contends otherwise.

accused the government of withholding critical evidence by not showing the jury the Post-Arrest Interview Video and Dash Camera Segment. According to defense counsel, these recordings were the "[m]ost powerful piece[s] of evidence in the case":

> [Detective Snyder] testified that . . . Mr. Hernandez cried throughout the entire interview. And he said that that audio and recorded interview would be the best evidence of what Mr. Hernandez said and his demeanor. They didn't play it for you. They didn't play that interview for you. The best evidence we have that shows how he was, what he said, how he acted, his demeanor. Why would they hide that from you? Why wouldn't they play that? Because it shows how emotional he was; it shows how upset he was and distraught he was over his mother.
>
> They played snippets of Officer Seale's rear-facing camera footage, and Officer Seale talked about how emotional Mr. Hernandez got talking about his mother, that he made some hard-to-understand statements about his mother being in danger and him being afraid of it.
>
> They didn't play that for you. What are they hiding? Why wouldn't they do that? Most powerful piece of evidence in the case, and they didn't show it to you.

RIII.218–19.

In its rebuttal closing argument, the government reminded the jury that Detective Snyder "was subject to all the questions [defense counsel] wanted to ask him about th[e] [post-arrest] interview." RIII.226–27. The government said Detective Snyder's trial testimony was "consistent with the video[.]" RIII.227. And if defense counsel "had any quibbles" with that

11

testimony, the prosecutor emphasized, "he could have played the video and impeached [Detective] Snyder with that." RIII.227.

The jury convicted Mr. Hernandez of possession with intent to distribute, and the district court sentenced him to 120 months in prison followed by five years of supervised release.

This timely appeal followed.

## II

Mr. Hernandez raises a single issue in support of reversal. He argues the district court erred under Federal Rule of Evidence 106 by refusing to admit the Post-Arrest Interview Video and the Dash Camera Segment. Before addressing the merits of Mr. Hernandez's arguments, we first must decide the proper standard of review—a threshold issue the parties dispute. In his opening brief, Mr. Hernandez argues the merits of his Rule 106 issue under the abuse-of-discretion standard. The government responds that Mr. Hernandez's argument "is subject to plain error review" because he "did not raise or even mention" Rule 106 in the district court. Ans. Br. at 15. In his reply brief, Mr. Hernandez for the first time invokes Federal Rule of Evidence 103(a)(2), contending he preserved the issue by putting the court on notice of his objection. Reply Br. at 5. And in the alternative, he argues plain error.

We first describe the standards for preserving evidentiary objections and then explain why Mr. Hernandez has not satisfied them.

"A ruling or order that admits or excludes evidence is governed by Federal Rule of Evidence 103." FED. R. CRIM. P. 51(b). Rule 103(a) in turn sets forth what a party must do to preserve a claim of evidentiary error. "A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and . . . if the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context." FED. R. EVID. 103(a)(2). "Normally," when the error is preserved, we "review the district court's evidentiary decisions for abuse of discretion." *United States* v. *Paycer*, 154 F.4th 1261, 1271 (10th Cir. 2025). But if not preserved, "this court's review is limited to plain error." *Id.*; *see also* FED. R. EVID. 103(e) ("A court may take notice of a plain error affecting a substantial right, even if the claim of error was not properly preserved."); FED. R. CRIM. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.").

Mr. Hernandez never mentioned Rule 106 in the district court, and he does not suggest otherwise on appeal. Still, Mr. Hernandez insists he "complied with" Rule 103(a)(2)'s requirements. Reply Br. at 5. He says he "proffer[ed] the complete recording from [Sergeant] Seale's dash cam video"

13

and "the complete recording of Detective Snyder's interrogation[.]" Reply Br. at 4. Under these circumstances, Mr. Hernandez argues, "[t]he district court was well aware [he] sought to play the remainder of [the] two recordings because they were the 'most important piece[s] of evidence' and were 'his story.'" Reply Br. at 5.

We are not persuaded. Mr. Hernandez never cited Rule 106 as "[t]he specific ground" for his objection. *See United States* v. *Ramirez*, 348 F.3d 1175, 1181 (10th Cir. 2003) ("The specific ground for reversal of an evidentiary ruling on appeal must . . . be the same as that raised at trial." (internal quotation marks omitted)). And he does not argue the substance of his objection was "apparent from the context."[10] FED. R. EVID. 103(a)(2); *see United States* v. *Wiseman*, 297 F.3d 975, 979 (10th Cir. 2002) ("Ordinarily, issues not raised by a party on appeal are deemed waived."). Mr. Hernandez must therefore show he "inform[ed] the court of [the] substance" of his objection "by an offer of proof[.]" FED. R. EVID. 103(a)(2).

---

[10] Nor would such an argument succeed on this record. Defense counsel urged the district court to admit the Post-Arrest Interview Video because it was Mr. Hernandez's "statement[,]" "the first time he tells the story[,]" and "important[.]" RIII.30, 167–68. And the only ground defense counsel marshaled for admitting the Dash Camera Segment was—again— a conclusory assertion about the "importan[ce]" of the evidence and his desire for "the jury to see how emotional Mr. Hernandez was[.]" RIII.71. That is not a legitimate evidentiary basis for admission. Nor does it have anything to do with Rule 106.

"In order to qualify as an adequate offer of proof, the proponent must, first, describe the evidence and what it tends to show and, second, identify the grounds for admitting the evidence." *United States* v. *Adams*, 271 F.3d 1236, 1241 (10th Cir. 2001). "If the proponent's offer of proof fails this standard, then this court can reverse only in instances of plain error that affected appellant's substantial rights." *Id.* "[W]e have previously stated that 'merely telling the court the content of . . . proposed testimony' is not an offer of proof." *Polys* v. *Trans-Colo. Airlines, Inc.*, 941 F.2d 1404, 1407 (10th Cir. 1991) (quoting *Gates* v. *United States*, 707 F.2d 1141, 1145 (10th Cir. 1983) (per curiam)).

But this is just what Mr. Hernandez did with respect to both recordings. The record shows the district court knew *what* evidence Mr. Hernandez wanted to admit, but Mr. Hernandez never identified the grounds for admission. True enough, Mr. Hernandez was not required to "use any particular language" in the district court to preserve his objection. *Holguin-Hernandez* v. *United States*, 589 U.S. 169, 174 (2020). But he never "alert[ed]" the district court to his Rule 106 argument, whether by specific reference to the rule or in substance. *United States* v. *Cates*, 73 F.4th 795, 809 (10th Cir. 2023) (quoting *GeoMetWatch Corp.* v. *Behunin*, 38 F.4th 1183, 1206 (10th Cir. 2022)).

Accordingly, we agree with the government that Mr. Hernandez's Rule 106 argument is indeed forfeited. The consequence of forfeiture in trial court is plain-error review in the court of appeals. *See United States* v. *Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019) (stating that when "an appellant raises a forfeited argument on appeal, we will reverse only if [he] can satisfy our rigorous plain-error test"). The government briefly contends we should not review Mr. Hernandez's argument even for plain error "[b]ecause Mr. Hernandez does not acknowledge or address the plain error standard in his opening brief[.]" Ans. Br. at 16. But "we have left open the door for a criminal defendant to argue error in an opening brief and then allege plain error in a reply brief after the Government asserts waiver." *Leffler*, 942 F.3d at 1198. Mr. Hernandez advances a sufficiently developed plain error argument in his reply brief, and so we exercise our discretion to review the Rule 106 issue under that standard.

### III

We now turn to the merits. We will not reverse for plain error unless Mr. Hernandez demonstrates "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Paycer*, 154 F.4th at 1271 (internal quotation marks omitted). This is a "demanding standard," *United States* v. *McGehee*, 672 F.3d 860, 876 (10th Cir. 2012), and one that is

"intentionally difficult to satisfy[,]" *Paycer*, 154 F.4th at 1271; *see also United States* v. *Berryhill*, 140 F.4th 1287, 1293 (10th Cir. 2025) (explaining a defendant must carry his burden on all four prongs to prevail under the plain-error standard). Mr. Hernandez fails at the outset: He has not shown the district court erred under Rule 106.

## A

Rule 106 states, "If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection." FED. R. EVID. 106. "The purpose of Rule 106 is to prevent a party from misleading the jury[.]" *United States* v. *Lopez-Medina*, 596 F.3d 716, 735 (10th Cir. 2010) (quoting *United States* v. *Moussaoui*, 382 F.3d 453, 481 (4th Cir. 2004)). We have explained that Rule 106, "often referred to as the rule of completeness," does not create "a general right to introduce selected statements to try to counter the statements in the proponent's offered segment." *United States* v. *Williston*, 862 F.3d 1023, 1038 (10th Cir. 2017). Rule 106 instead "functions as a defensive shield against potentially misleading evidence proffered by an opposing party." *Echo Acceptance Corp.* v. *Household Retail Servs., Inc.*, 267 F.3d 1068, 1089 (10th Cir. 2001).

17

The advisory committee notes reinforce the rule's limited purpose. Rule 106 "applies only to the narrow circumstances in which a party has created a misimpression about the statement, and the adverse party proffers a statement that in fact corrects the misimpression." FED. R. EVID. 106, advisory committee's note to 2023 amendments. "The mere fact that a statement is probative and contradicts a statement offered by the opponent is not enough to justify completion[.]" *Id.* In sum, "[o]nly the portions of a statement that are relevant to an issue in the case *and* necessary to explain or clarify the already-admitted portions need be admitted." *Williston*, 862 F.3d at 1038 (emphasis added).

We have identified "four factors" for courts to "consider" when determining admissibility under Rule 106: "[W]hether the statement or statement portion . . . (1) explains the admitted evidence, (2) puts the admitted evidence in context, (3) does not itself mislead the jury, and (4) ensures that the jury can fairly and impartially understand the evidence." *Id.* at 1038–39. "A defendant seeking reversal based on a violation of the rule of completeness faces a high bar. The contours of the fairness standard are 'rather vague' and courts have 'enormous discretion' in applying the rule." *United States* v. *Harry*, 816 F.3d 1268, 1280 (10th Cir. 2016) (quoting 1 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE, § 106.02[1], at 106–4 to 106–6 (2d ed. 1997)).

18

**B**

Mr. Hernandez argues the Post-Arrest Interview Video and Dash Camera Segment "easily qualify" under the *Williston* factors and were admissible under Rule 106.[11] Op. Br. at 37. We are not persuaded.[12]

As to the first factor, Mr. Hernandez says the recordings were needed to "explain the admitted portion by stating why [he] took possession of the illegal drugs found at the . . . traffic stop." Op. Br. at 37. But Detective Snyder testified about the reason Mr. Hernandez gave for completing the drug deliveries—his fear that Primo would harm his mother. And Mr. Hernandez dispelled any lingering doubt as to his motives when he testified at length about Primo's threats to his mother. *See, e.g.*, RIII.129 ("Practically what Primo said. He said he was going to chop her head off.").

---

[11] Mr. Hernandez generally discusses the Post-Arrest Interview Video and Dash Camera Segment together under the four factors, drawing no legal distinction between these pieces of evidence for purposes of his Rule 106 argument. We thus take the same approach.

[12] Mr. Hernandez does not connect the recordings he wanted to introduce under Rule 106 to any particular evidence, referring, without elaboration, to an unspecified "admitted portion." *See* Op. Br. at 37–38. For example, he does not specifically argue the Post-Arrest Interview Video was needed to complete statements the government admitted through Detective Snyder's testimony. Nor does he specifically argue the Dash Camera Segment was needed to complete statements the government admitted in its portion of the dash camera footage. Rather, he appears to suggest the district court should have admitted the recordings in their entirety to explain or clarify the government's evidence *generally*. We doubt Rule 106 is so sweeping. But even understood as broadly as Mr. Hernandez urges, we discern no error.

As to the second factor, Mr. Hernandez claims the Post-Arrest Interview Video and Dash Camera Segment were needed for context. According to Mr. Hernandez, the recordings "detail[] all the actions Primo took to coerce [him] to commit the crime and . . . graphically illustrate the emotional turmoil [he] experienced in having to transport the illegal drugs." Op. Br. at 37–38. He further contends Detective Snyder made him "look like nothing more than an all-too-common illegal drug courier who wanted to make a small profit[,]" and "left out the eight or more times [he] literally broke down emotionally trying to explain his involvement[.]" Op. Br. at 29. On the record before us, we disagree. Detective Snyder told the jury Mr. Hernandez cried throughout the interview. Sergeant Seale likewise testified Mr. Hernandez was emotional and made statements about fearing for his mother's safety. Nothing about their testimonies required additional context. *See United States* v. *Lemon*, 714 F. App'x 851, 860 (10th Cir. 2017) (unpublished) (holding the defendant's admitted statement was "simply not misleading because no further context [was] necessary to have an appropriate impression of the statement").[13]

---

[13] We rely on this unpublished decision for its persuasive value in resolving this appeal. *United States* v. *Engles*, 779 F.3d 1161, 1162 n.1 (10th Cir. 2015) (citing 10th Cir. R. 32.1); *United States* v. *Woodmore*, 127 F.4th 193, 218 n.14 (10th Cir. 2025) ("[W]e rely on unpublished cases for their persuasive value and do not treat them as binding precedent.").

The third factor may tip slightly in Mr. Hernandez's favor. We see no reason the records themselves would "mislead the jury[.]" *Williston*, 862 F.3d at 1038. But Mr. Hernandez does not even make this argument. He contends only the Post-Arrest Interview Video and Dash Camera Segment "avoid misleading the trier of fact into thinking [he] was a professional drug courier[.]" Op. Br. at 38. Mr. Hernandez suggests the recordings show he "in fact had a good job that was jeopardized by Primo's intentions of harming [his] mother if [he] failed to deliver the drugs."[14] Op. Br. at 38. Mr. Hernandez's argument elides our legal inquiry under Rule 106 and focuses instead on his position that the recordings would have advanced his duress defense.

The fourth factor does not favor Mr. Hernandez. He maintains the recordings were "the best and most compelling way for [him] to present his duress defense" because they "graphic[ally] . . . portray[] his fear that his mother would be harmed[.]" Op. Br. at 38. His argument again misunderstands Rule 106. The rule is not a mechanism for admitting "the best" evidence in support of a party's position. As we have explained, the

---

[14] Mr. Hernandez's argument appears to relate specifically to the Post-Arrest Interview Video. There, he explained to Detective Snyder that he worked at an auto detailing company. The Dash Camera Segment does not contain any statements about Mr. Hernandez's regular employment.

21

exclusive function of Rule 106 "is to prevent a party from misleading the jury[.]" *Lopez-Medina*, 596 F.3d at 735 (quoting *Moussaoui*, 382 F.3d at 481).

Under these circumstances, and applying the correct understanding of Rule 106, we cannot say Mr. Hernandez has carried his burden to show error in the district court's decision to exclude the Post-Arrest Interview Video and Dash Camera Segment.

## C

Mr. Hernandez advances a few more arguments to show the district court erred under Rule 106. Not one is availing.

*First*, Mr. Hernandez challenges the district court's "refus[al] to admit" the Post-Arrest Interview Video and Dash Camera Segment based on its determination that they are hearsay—a ruling, he says, that "expressly contravened the revisions enacted to [Rule] 106 in December[] 2023[.]" Reply Br. at 29–30; *see also* Op. Br. at 40 (arguing the district court's exclusion of the recordings as hearsay "was inconsistent with the new revisions made to [Rule] 106"). This argument is flawed.[15]

---

[15] As the government points out, Mr. Hernandez "does not dispute" the Post-Arrest Interview Video and Dash Camera Segment "are hearsay" or contend the recordings "were admissible under any exceptions provided in Rule 801." Ans. Br. at 18. We thus assume, as the district court concluded, the video recordings were hearsay because they were being

(continued)

Effective December 1, 2023, Rule 106 was amended to add the current language permitting a party to complete a statement "over a hearsay objection." FED. R. EVID. 106. This amendment resolved a "conflict over whether completing evidence properly required for completion under Rule 106 can be admitted over a hearsay objection." FED. R. EVID. 106, advisory committee's note to 2023 amendments. Contrary to Mr. Hernandez's suggestion, however, it was not a "change[]" in the law—at least not in our circuit. Reply Br. at 27. As the government correctly observes, our pre-amendment cases already "allowed admission of evidence under Rule 106 'even when the evidence the adverse party s[ought] to introduce [was] hearsay evidence.'" Ans. Br. at 19 n.10 (quoting *Lemon*, 714 F. App'x at 860); *see also Harry*, 816 F.3d at 1279–80 (explaining Rule 106's "fairness principle can override the rule excluding hearsay").

In any event, Mr. Hernandez's reliance on the December 2023 amendment to Rule 106 is misdirected. The district court did not exclude the recordings because they are hearsay when it would have otherwise admitted them under Rule 106. It excluded the recordings because they are hearsay, and Mr. Hernandez never proffered a legitimate evidentiary basis

---

offered by the defense rather than the government. *See* FED. R. EVID. 801(d)(2) (stating a statement is not hearsay if it is "offered against an opposing party").

for their admission. *See United States* v. *Willie*, 941 F.2d 1384, 1394 (10th Cir. 1991) (noting a district court need not "imagine some admissible purpose" for proffered evidence).

*Second*, Mr. Hernandez appears to suggest the Post-Arrest Interview Video was admissible under Rule 106 because "the quality of the interpreter's ability" to translate what Mr. Hernandez said during the interview "was open to question." Op. Br. at 8. Specifically, he says the language line interpreter incorrectly told Detective Snyder that Mr. Hernandez did not "want [his] mother to know," when he really said, "I just don't want them to do anything to my mom." Op. Br. at 8–9. This is not a basis for *sua sponte* admission under Rule 106.

And even so, the jury was not misinformed about what Mr. Hernandez told Detective Snyder. True, Detective Snyder initially relayed the mistranslation to the jury during direct examination. When asked at trial to recount "the very first thing Mr. [Hernandez] told [him] after [he] read him his *Miranda* warnings[,]" Detective Snyder testified that Mr. Hernandez said, "I don't want my mother to know." RIII.82. But Mr. Hernandez later corrected Detective Snyder's misleading statement when he testified in his defense. *See* RIII.129 ("[A]t the beginning of the interview

24

the translator said that I didn't want my mother to find out, and I said that I didn't want anything bad to happen to my mom.").[16]

*Third*, Mr. Hernandez identifies several statements from the post-arrest interview that Detective Snyder did not relay to the jury at trial. *See* Op. Br. at 29 ("Officer Snyder provided only half of [Mr. Hernandez]'s explanation about how a Mexican drug dealer had contacted him and arranged for him to pick up illegal drugs in Los Angeles and deliver them to Little Rock."); Op. Br. at 30–31 ("The recordings additionally showed [Mr. Hernandez] explain that he made no profit whatsoever[.]"). But Rule 106 does not compel completeness for its own sake. *Cf. United States* v. *Phillips*, 543 F.3d 1197, 1203 (10th Cir. 2008) ("Rule 106 does not prohibit admission of an incomplete document."). It is a "*defensive shield* against potentially *misleading* evidence proffered by an opposing party." *Echo Acceptance Corp.*, 267 F.3d at 1089 (emphasis added). As we have explained, Mr. Hernandez fails to show the government's evidence was misleading.[17]

---

[16] We note defense counsel thoroughly cross-examined Detective Snyder about potential deficiencies in the translation service. The jury thus heard about how a second translator "took over during the interview[,]" the translator was "paraphrasing" Mr. Hernandez's responses, Mr. Hernandez had to "correct" the translator "a couple of times[,]" and the translator "gave [Detective Snyder] the impression that Mr. Hernandez's job was somehow involved in the trips he was taking[.]" RIII.94–95.

[17] Mr. Hernandez asserts in passing that "[t]he entire" Post-Arrest Interview Video and Dash Camera Segment "did not need to be played." Op.

(continued)

25

Mr. Hernandez fails to show the district court erred—let alone plainly—by not admitting the Post-Arrest Interview Video and Dash Camera Segment under Rule 106. Given our conclusion, "we need not reach the other three prongs of plain error review" or the parties' associated arguments. *United States* v. *Wireman*, 849 F.3d 956, 966 (10th Cir. 2017).

## IV

We **AFFIRM** Mr. Hernandez's conviction for possession with intent to distribute in violation of 21 U.S.C. § 841(a)(1).

Entered for the Court

Veronica S. Rossman
Circuit Judge

---

Br. at 39. He notes the government "played more than 20 minutes of tapes in the presentation of its own case[,]" and suggests defense counsel "could have been given an equivalent amount of time to present his best defense by playing" certain portions of the recordings. Op. Br. at 39. But Mr. Hernandez does not identify with any specificity which portions were "necessary to explain or clarify the already-admitted" evidence. *Williston*, 862 F.3d at 1038. Indeed, he makes no attempt to situate this argument within the framework of Rule 106. We therefore find this cursory argument waived. *See United States* v. *Clay*, 148 F.4th 1181, 1201 (10th Cir. 2025) (noting that we do not consider "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation" (internal quotation marks omitted)).